UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **VINCENT** | * | **10-1241** |
| | * | |
| **V.** | * | **SECTION: J** |
| | * | |
| **NORMAND ET AL.** | * | **JUDGE BARBIER** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**ORDER AND REASONS**

Before the Court are Petitioner **Brandon Vincent's Petition for Writ of Habeas Corpus (Rec. Doc. 1)**, Respondents **Sheriff Newell Norman and Jefferson Parish Correctional Facility's Opposition (Rec. Doc. 7)**, and Petitioner's **Reply in Support (Rec. Doc. 13)**.

**PROCEDURAL HISTORY AND BACKGROUND FACTS**

Petitioner was convicted in state court of two counts of oral sexual battery–one committed upon juvenile MV and one committed upon juvenile FS. After denying the Petitioner's motion for new trial, the court sentenced Petitioner to eight years on each count to be served concurrently. The Louisiana Fifth Circuit Court of Appeal recounted the events leading up to the arrest of Petitioner:

> Defendant/appellant, Brandon A. Vincent ("Vincent"), appeals his conviction of two counts of oral sexual battery of two different juveniles in violation of LSA-R.S. 14:43.3. Following his conviction, Vincent was sentenced to eight years on each count to run concurrently with each other. We affirm the convictions and remand with instructions.
>
> The juvenile victim, M, testified at trial that, in 2003, she spent weekends at the home of her aunt, Helen, and that Vincent, her cousin, began living there. During

those visits, M performed oral sex on Vincent approximately ten times, beginning in the summer of 2003, before she started fifth grade when she was twelve years old. Vincent was eighteen at the time. M testified that the incidents continued to occur during her fifth-grade year.

M described the first incident as follows: she was sitting in the front room watching television when Vincent asked her to "come here," into his room. When she complied, he asked her to give him a "blow job." M testified that he sat down and took his penis out of his pants, and that she then got on her knees and put his penis in her mouth for five or ten minutes. M indicated that her aunt was not there at the time.

Later on, M asked Vincent if he would introduce her to his girlfriend's brother, Michael, and he said he would. Prior to each incident, Vincent would say, "If you give me a blow job I'll hook you up with Michael."

M testified that her aunt was never home during these incidents except one time. On that occasion, M's aunt was sitting in the kitchen drinking coffee when Vincent called M to come into his room, asking for a "blow job" and promising an introduction to Michael. All except one incident, which occurred in the front room, took place in Vincent's bedroom.

M said that the last time a similar incident occurred with Vincent was at her own house when Vincent came over and her family was not at home. He again asked her to give him a "blow job," and she did. Afterwards, M stopped going to her aunt's house because she did not want the incidents to happen anymore. She explained that the incidents made her feel like "nothing" and "worthless," and she blamed herself for them at the time. M finally told Shannon, a counselor at school, about the events because she kept having nightmares. M also told Shannon that a similar incident happened to her friend, F. M stated that she and F went to Helen's house to ask Helen if M could spend the night at F's home. M and F were sitting on the sofa in the front room when Vincent came in and pulled F into his bedroom, locking the door. M started banging on the door trying to get in. She looked through a hole in the door and saw that Vincent had F "pinned" to the ground. M finally gave up and went and sat down on the sofa and watched television.

M explained that F eventually came out of the room and told her what happened. M then told F what Vincent had done to her, and the girls promised each other at that time that they would never tell anybody what had happened. F was upset and didn't want her family to find out what had happened.

M then testified that, on another occasion, she and F were at her aunt's house when Vincent called F into his bedroom. She came out a few minutes later and

said that Vincent wanted M. M went into the bedroom, and Vincent asked her for another "blow."

F testified that in August of 2003, she and M went to Helen's house to see if M could spend the night at F's house. Helen told them to wait because she had to go to the store to pick up her sister. After Helen left, F was sitting on the sofa in the living room watching television, and M was in Vincent's room. F testified that Vincent then came into the room and asked her to come into his room. F refused, so Vincent pulled her into the bedroom, pushing M out. Vincent locked the door, and M started banging on the door and cursing. At first, F thought Vincent was "playing," but when she asked to leave, he refused. Vincent then asked her if she wanted to "suck his d . . . " and she said "no." After she refused, he got on top of her and put his penis into her mouth, put his hand on top of her head and moved her head back and forth. When Helen returned home, Vincent stopped and F got up, pushing F out the door and telling her not to tell anyone or "something else might happen." F was scared during the incident and noted that Vincent had pictures of nude women on his wall.

Shannon Cumming, a teacher and school "prevention specialist," testified that M confided to her that her eighteen-year-old cousin was making her give him "blow jobs." M told her it happened when her aunt left the house, and that it had also happened to one of her friends, F. M appeared to be very upset and embarrassed.

Dr. Scott Benton ("Dr. Benton"), who was qualified as an expert in the field of forensic pediatric medicine, testified that Dr. Marymer Perales ("Dr. Perales"), his senior fellow, interviewed and examined M on February 20, 2004. The interview was taped. Dr. Benton testified that there were no physical findings, which was not inconsistent with the history M gave of penile-oral penetration. The delay in reporting the incident was not unusual.

Dr. Ellie Wetsman ("Dr. Wetsman"), who was qualified as an expert in the field of pediatric forensic medicine, testified that she interviewed F on April 28, 2004. Dr. Wetsman also examined F that day, but there were no physical findings. F related that Vincent pulled her into his room and made her put her mouth on his private area. Vincent told her not to tell anybody or something else might happen, "probably kill me or rape me." She explained that findings were not expected, since the incident had occurred the previous August. She testified that it was common for children to delay reporting incidents of abuse for many reasons: the child does not know the incidents are wrong, the child is ashamed or embarrassed, the perpetrator tells the child that it is the child's fault and the child is to blame and that the child will be punished, or the perpetrator may bribe the child not to tell or threaten them.

Omalee Gordon ("Gordon") testified that she was employed by the Gretna Police

3

>Department and assigned to the Jefferson Children's Advocacy Center as a forensic interviewer. Gordon interviewed both victims, and both interviews were taped and played for the jury.
>
>After the State rested, the defense called Helen as a witness. Helen testified that she recalled the time M and F came over in August of 2003 to ask if M could spend the night at F's house. Helen insisted that Vincent was not there when M and F got there, and she did not recall his being there at all that day. Helen also insisted that there never was a time when she left M and F alone to run errands, and that she never left M alone at her house, as she did not believe in leaving kids under 16 years of age on their own. However, she admitted that Vincent was at her house one time when M and F were there.
>
>Shelly, the girlfriend of M's brother, testified that, soon after everything came out, she overheard M telling her mother, stepfather, and brother that she was lying, but could not change her story now and would not anyway. Shelly also overheard something regarding the district attorney, Vincent, and a meeting. Shelly testified that she did not come forward sooner because she did not want anybody to "hate" her, and she did not want to hurt anybody. She then stated that Vincent's mother had asked her to come to court and testify.

State v. Vincent, 978 So.2d 967, 969-71, 07-239 (La. App. 5 Cir. 12/27/07).

Petitioner appealed his conviction through the state-court system.

After Petitioner's conviction was confirmed in the state-court system, Petitioner filed a second motion for new trial upon learning that MV wished to recant her testimony. Prior to filing this second motion, counsel conducted a recorded interview of MV during which her grandmother was present. During the interview, MV stated that she was asked to lie by FS to retaliate against Petitioner for not going out with FS. MV explained that FS pressured her to lie by threatening to report her for curfew violations.

Although during the interview MV stated that she wished to recant her testimony, MV exercised her Fifth Amendment right during the hearing of Petitioner's second motion for new trial. MV, represented at the hearing by a public defender, testified that she was incarcerated in the Youth House and received training for motherhood–as she was six months pregnant. Both

MV's mother and Petitioner's grandmother testified that MV had told them that she had lied about Petitioner's actions. The court denied Petitioner's motion for a new trial, and Petitioner appealed this denial through the state-court system.

Petitioner now files this timely Petition under 28 U.S.C. § 2254.

### THE PARTIES' ARGUMENTS

Petitioner alleges that prior to the hearing on his second motion for a new trial, Assistant District Attorney Roger Jordan (ADA Jordan) committed prosecutorial misconduct when he visited MV in a juvenile correctional facility. According to Petitioner, and MV's sworn affidavit, ADA Jordan told MV that if MV changed her story, she would spend five years in "big people jail" and her baby would be taken from her.

Petitioner points out that in an unrelated case, ADA Jordan was found to have knowingly withheld exculpatory evidence in a capital murder prosecution in violation of Brady v. Maryland, 373 U.S. 83 (1963). See In re Roger W. Jordan, Jr., 2004-B-2397 (La. 6/29/05), 913 So. 2d 775.  Petitioner argues that ADA Jordan also violated Petitioner's due process rights in this case by intimidating a witness, especially a pregnant juvenile witness, into silence. Although Petitioner recognizes that recantations can be suspicious, he maintains that in certain circumstances like his, motions for new trial should be granted based on recanted testimony.

Petitioner notes that no medical evidence was presented to corroborate the witnesses' testimony. Moreover, Petitioner explains that inconsistences exist between the trial testimony of FS and the trial testimony of MV–for example, inconsistencies exist with respect to the number of assaults, whether Petitioner assaulted both of them on the same day, whether car lights were viewable through Petitioner's window, what color Petitioner's room was, how long the assaults

lasted, and whether Petitioner's aunt was home at the time of the assaults.

Respondents argue that the Court should decline federal habeas review pursuant to the Concurrent Sentence Doctrine because Petitioner does not challenge the conviction regarding oral sexual battery upon FS. Pursuant to this doctrine, a federal habeas court may decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction.

Courts can employ the concurrent sentence doctrine if there are no adverse collateral consequences. According to Respondents, no adverse collateral consequences could result from the Court's exercise of discretion here. Petitioner's challenges concern only one count of his two-count conviction, both of which carried eight-year sentences. Even if Petitioner prevailed, he would still have to serve his other eight-year sentence. Moreover, Respondents contend that Petitioner would be procedurally barred from challenging his other conviction with respect to FS.

In the alternative, Respondents argue that MV invoked the Fifth Amendment at Petitioner's hearing because of advice given to her by her public defender. Although Respondents deny that ADA Jordan intimidated MV, they insist that informing a witness that she could be charged with perjury does not amount to prosecutorial misconduct. Respondents point out that the state court found that the ADA Jordan did not commit prosecutorial misconduct by informing MV that she could face a perjury charge.

Respondents also address two "subclaims" which were presented in Petitioner's Petition, but were not formally listed as grounds for relief–(1) that Petitioner is entitled to relief because of MV's recantation and (2) that Petitioner alleges inconsistencies in the trial testimony.

Respondents explain that the state courts denied these specific subclaims because they could have been, but were not, raised on appeal; accordingly, Petitioner is procedurally barred from raising these challenges via state collateral review. Because a state-law default prevents the state court from reaching the merits of the claim, the claim can also not be reviewed in federal court.

In his Reply, Petitioner highlights MV's emotional state, her youth, and her physical condition and questions how meaningful the attorney-client relationship was between MV and the public defender with whom she spoke for several minutes.

## DISCUSSION

Defendants urge the Court to decline review under the concurrent sentence doctrine, a tool employed by courts in the interests of efficiency and judicial economy in situations "whereby the existence of one valid conviction makes unnecessary the review of other convictions which run concurrently with the valid conviction." Varnado v. Cain, 2004 WL 2984804 at *3 (E.D. La. 2004) (citing United States v. Stovall, 825 F.2d 817, 824-25 (5th Cir. 1987). Under such circumstances, "it is proper for a court to decline review [of] identical sentences on other grounds and to deny habeas relief on that basis." Id. (citing Williams v. Maggio, 714 F.2d 554, 555 (5th Cir. 1983). "However, if the possibility exists that a prisoner may suffer adverse collateral consequences from the unreviewed convictions, then a habeas petition should be dismissed without prejudice to them." Id. (citing Scott v. State of Louisiana, 934 F.2d 631, 635 (5th Cir. 1991).

Petitioner was convicted in state court of two counts of oral sexual battery–one committed upon MV and one committed upon FS. Petitioner was sentenced to eight years on each count to be served concurrently. Petitioner's habeas petition only challenges the conviction

of oral sexual battery upon MV; it makes no mention of the count against FS. Because Petitioner would have to serve the remainder of his eight-year sentence for the count of oral sexual battery committed upon FS regardless of the outcome of his instant habeas petition, the Court concludes that the concurrent sentence doctrine is applicable. Accordingly, the Court declines to review Petitioner's petition and denies habeas relief.

Petitioner has not shown how he would be adversely affected as a result of the imposition of both of the sentences. Under La. Rev. Stat. Ann. § 15:541, Petitioner is subject to the same sex-offender registry requirements for one count of oral sexual battery committed upon a minor as he is for two counts of the same offense.

**IT IS ORDERED** that Petitioner **Brandon Vincent's Petition for Writ of Habeas Corpus (Rec. Doc. 1)** is hereby **DENIED.**

New Orleans, Louisiana, this 15th day of July, 2011.

_____
Carl J. Barbier
U.S. District Judge